NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 13, 2017
Decided May 15, 2018

**Before**

DIANE P. WOOD, *Chief Judge*

DANIEL A. MANION, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 17-1706

| | |
|---|---|
| ANGELA M. BRINLEY,<br>    *Plaintiff-Appellant,*<br><br>    *v.*<br><br>NANCY A. BERRYHILL, Deputy<br>Commissioner for Operations, Social<br>Security Administration,<br>    *Defendant-Appellee.* | Appeal from the United States District<br>Court for the Southern District of<br>Indiana, Indianapolis Division.<br><br>No. 16-cv-00360-MPB-TWP<br><br>Matthew P. Brookman,<br>*Magistrate Judge.* |

**O R D E R**

Angela Brinley suffers from a host of medical problems, both physical and mental. She applied for disability insurance benefits and supplemental security income, claiming disability based on fibromyalgia, migraines, hypertension, depression, and anxiety. An administrative law judge concluded that she had moderate mental difficulties, but that she nonetheless could work with certain limitations. She appealed to the district court, which upheld the denial of benefits. Now she has turned to this court, where she again urges that the ALJ failed to account adequately for her mental impairments. We agree with her that the ALJ did not point to substantial evidence

supporting his findings, and so we remand this case to the agency for further proceedings.

**I**

Brinley was 42 years old when she filed her application for benefits. She identified eight conditions in support of her request: fibromyalgia, depression, anxiety, chronic migraines, pain, fatigue, plantar fasciitis, and carpel tunnel syndrome. She had some skills at the time: she had earned a GED and a certificate as a medical assistant, and she had worked as a medical technician, a medical assistant, and an ambulance dispatcher.

She sought mental-health treatment in 2008, when she was diagnosed with depression and anxiety. In September of that year, her therapist assigned her a "Global Assessment of Function, or GAF, of 61-70. (This is a measure that is no longer recognized in the American Psychiatric Association's DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, but it was used routinely in social security disability hearings during the time of Brinley's proceedings. See *Price v. Colvin*, 794 F.3d 836, 839 (7th Cir. 2015).) Brinley's score indicated that she suffered from some mild symptoms or had some social difficulties, but otherwise was able to function relatively well. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994). Throughout that year, Brinley complained of pain severe enough to affect her mood and functioning both at work and at home. At one appointment, her therapist noted symptoms such as decreased concentration, depression, fatigue, irritability, memory impairments, tearfulness, and crying. Brinley regularly reported that her episodes of depression and anxiety were correlated with increased physical pain.

In early 2009, her GAF score dropped to 51-60, which reflects moderate symptoms such as flat affect and panic attacks, or moderate difficulties in social functioning. AM. PSYCHIATRIC ASS'N, *supra*. At that time she reported that she experienced nerve pain when she exercised, and that she was struggling with concentration, increased anger, and socialization. In March 2009 her doctor prescribed nerve pain medication and antidepressants, which led to some mental-health improvements, reflected in a return to a 61-70 GAF score.

Throughout 2009, Brinley also continued to suffer from her physical impairments. Doctors at the Indiana University Hospital diagnosed her with fibromyalgia and fatigue. At the Hospital's pain clinic, she reported that she suffered

from aching pain in her shoulders, back, and legs throughout the day. Later that year, another physician diagnosed her with both migraines and daily, chronic headaches.

After the fibromyalgia diagnosis, Brinley's physician prescribed methadone, but she had a very negative reaction to it. Methadone is a powerful opioid with a well-deserved reputation for abuse. Brinley knew that and was anxious about using it. While taking it, she suffered from vomiting and anxiety attacks, fever, chills, and flu-like symptoms. The doctor then switched her to a fentanyl patch, which she abandoned after she learned that it was more potent and addictive than morphine.

In November 2009 Brinley was fired from her job as an ambulance dispatcher, for excessive tardiness and pain-related absences. Though she later tried to sell cosmetics, she never again was gainfully employed. She lost her health insurance and then—for financial reasons—she stopped her mental-health treatment. Around that time she resumed using methadone; her physician increased the dosage in May 2010 because of her recurring pain.

Despite these strong measures, Brinley's pain continued. In May 2012, she reported that she had "continued generalized aching pain, which is also twisting, sharp, and tingly." Psychological tests showed that she was suffering from severe depression, nonrestorative sleep, and severe anxiety. The doctor who had prescribed the methadone decided that Brinley had to wean herself away from it; she did so. But that left the pain. Nearly a year later, she reported that she continued to have chronic migraines and was still dealing with pain and fatigue related to fibromyalgia.

Because her situation had not improved, she filed her initial claim for disability benefits in March 2013. In connection with that application, both Brinley and her husband filled out forms describing her limitations. Brinley wrote that she spent most days lying down, and that she had trouble with memory, concentration, and following verbal instructions. She also reported that she had some social issues related to her anxiety disorder, and that pain and stress exacerbated her panic attacks. Brinley's husband wrote that she spent "the majority of her waking hours lying down," and that he was the household's primary caregiver. There was also a form checklist, on which her husband did *not* tick off the boxes that asked about problems with memory or concentration.

The application also triggered an examination from a psychologist at the Indiana Disability Determination Bureau. His conclusion was that Brinley had major depressive

disorder and borderline personality traits. He noted that she had not received any treatment for her depression for four years. At the same time, he found that her concentration and attention were "intact" and that she could understand and follow simple instructions.

**II**

The Social Security Administration initially denied Brinley's claim. She then requested a hearing before an ALJ and was given one. At the hearing, both Brinley and a vocational expert (VE) testified. Brinley reported that she was in pain every day, all over her body, and that she spent most of the day lying down. She had difficulty climbing stairs. In addition to the fibromyalgia, she said that she suffered from migraines and irritable bowel syndrome. At that point she was taking an antidepressant, an anti-inflammatory drug, and a narcotic (not methadone) to treat her pain. Finally, she testified that she had attempted suicide in the past, including two attempts in 2013 alone.

The VE testified that a person with Brinley's limitations could find work in the national economy. The ALJ had asked the expert to consider the possible employment opportunities for a person of Brinley's age, education, work experience, and limitations identified by the ALJ—a list that included an inability to climb ladders, ropes, or scaffolds; the need to engage only occasionally in such tasks as climbing ramps or stairs, stooping, balancing, crouching, crawling, or kneeling; the ability to handle only "simple, routine, repetitive tasks in a low stress job, defined as [one] having no strict production quotas [and] no hazardous conditions; restriction to making decisions and coping with changes in work settings only occasionally. The VE announced that such a person could work as "a ticket seller," "housekeeper," or "laundry worker."

Based on that record, the ALJ worked through the agency's five-step analysis, see 20 C.F.R. §§ 404.1520(a), 416.920(a), and concluded that Brinley was not disabled. At Step 1 he found that she had not engaged in substantial gainful activity since November 18, 2009, her alleged onset date. At Step 2 he identified as severe impairments her fibromyalgia, migraines, hypertension, depression, and anxiety. At Step 3 he acknowledged that she had moderate difficulties with social functioning, because of her anxiety disorder, as well as moderate difficulty with concentration, persistence, or pace, because of her depression and memory issues. Nevertheless, he found that she did not meet any of the agency's listings for presumptive disability. Between Step 3 and Step 4, he determined that she had the residual functional capacity

(RFC) to perform light work with certain limitations—namely, that the work be limited to "simple, routine, and repetitive tasks, in a low stress environment." This RFC meant, at Step 4, that she was unable to perform her past relevant work. Finally, at Step 5, the ALJ concluded that Brinley was capable of performing the jobs that the VE had identified. The judge added that if she were to be off-task 20% of the workday, then no work would be available (as the VE had testified).

Brinley appealed to the agency's Appeals Council, which denied review. She then filed a petition for review in the district court, where the parties agreed to have a magistrate judge dispose of the case. See 28 U.S.C. § 636(c). In an oral ruling, the judge upheld the ALJ's RFC description and his decision. Of note here, he believed that the ALJ's decision to restrict Brinley to simple, routine, and repetitive tasks and a low-stress job were sufficient to account for the "factors likely to trigger" her mental limitations.

### III

We review the agency's decision deferentially, upholding its findings of fact if they are supported by substantial evidence—that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). That does not mean, however, that we are a rubber stamp. We must ensure that the ALJ has examined both the evidence favoring the claimant and the evidence against her. *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). In addition, the ALJ must explain how the evidence in the record supports his conclusion. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

Brinley's first point on appeal relates to the ALJ's assessment of her residual functional capacity and the hypothetical question he posed to the VE based on that assessment. She argues that neither the RFC nor the question properly accounted for his finding that she has "moderate" difficulties with social functioning. The limitation the ALJ proposed—that she perform only "simple, routine and repetitive tasks" in a low-stress environment—fails in her view to address her social-functioning deficits.

Brinley has a point. One can engage in simple, routine, and repetitive tasks in a room of 100 people jammed together in a cube farm, or one can sit alone and work in total isolation. (And it is worth noting in this connection that Brinley testified that she often manages her anxiety with meditation in a quiet room.) The simple task might be one that is a step in a 15-step process that requires close coordination with others, or it may be a stand-alone operation. A low-stress environment is similarly unhelpful as a

restriction, at least without further elaboration. An environment might be low-stress because the employer is satisfied with self-paced work and will tolerate low output, or it might be low-stress because the employees take lots of breaks, or it might be low-stress because the intellectual demands are modest. None of those possibilities excludes the need to be able to function socially at a normal level.

The ALJ's hypothetical question did not engage specifically enough with Brinley's limitations. He never used the phrase "moderate difficulties with social functioning," and we cannot look at the *absence* of that term and feel confident that this limitation was nonetheless properly incorporated in the RFC and in the hypothetical question. The ALJ may have thought, as the agency's brief speculates, that he was addressing Brinley's social difficulties by including limitations that would minimize the sort of activities that triggered her depression and anxiety, but again, we can only guess. At Step 3, the ALJ did note that Brinley had "some social issues with respect to her anxiety disorder" (whatever that means), but he determined that these "social issues" were not debilitating because she acknowledged that she was able to go to the store on a regular basis, attend church, and stay in touch with friends and family "usually by phone or through texting." The ALJ also mentioned the reports from Brinley's physician and psychiatrist describing her anxiety and panic attacks—attacks that were exacerbated by her methadone use or stress. But once again, the hypothetical did not necessarily address her problem with stress. If it is sparked by contact with groups larger than four or five rather than by job complexity, then the limitations the ALJ provided are of little help.

Brinley also argues that the RFC assessment failed to account for her difficulties in concentration, persistence, or pace. That is a closer call, in our view, but in the end, we still have trouble following the ALJ's reasoning. The limitations that the ALJ identified relied on Brinley's assertions that she has problems remembering things and following written instructions, as well as her assertion that a heightened level of stress affects her pain level. Her psychiatrist also confirmed that her depression is exacerbated by pain. Yet the hypothetical question that the ALJ posed to the VE did not direct the VE to consider problems with concentration, persistence, and pace.

The important question is whether, in substance, the ALJ's question directed the VE to consider those points, not what particular words the ALJ used. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Thus, where a claimant's limitations are stress-related and the hypothetical question restricts the claimant to low-stress work, there is no problem. See *Arnold v. Barnhart*, 473 F.3d 816, 820, 823 (7th Cir. 2007);

*Johansen v. Barnhart*, 314 F.3d 283, 285, 288–89 (7th Cir. 2002). But, as we noted earlier, Brinley experiences stress not only from the type of work she is being asked to do, but also from the social setting in which she must function. The ALJ's effort to restrict her to work that is least likely to worsen her pain and that is relatively simple to perform does not address the social problem.

Finally, Brinley argues that the ALJ violated Social Security Ruling 06-03p by failing to evaluate her husband's third-party report and not indicating what weight he gave to that report. (This ruling became effective on March 27, 2017, but it applies to all disability claims filed on or before that date. 82 Fed. Reg. 5844 ¶¶ 10, 12; 20 C.F.R. § 404.1527(f)). Under that ruling, an ALJ should explain the weight he gives to nonmedical opinions, or at least say enough to allow a claimant to understand his reasoning, including the role the nonmedical evidence plays in the decision. 20 C.F.R. § 404.1527(f)(2). All the ALJ did here was to mention the husband's report; he did not delve into it any further. On the other hand, Ruling 06-03p does not *require* the agency to take nonmedical evidence into account; it simply permits it.

Nevertheless, the fact that the husband's report echoes many of the points Brinley made in her own report is not a reason to disregard it; it is a reason to find that her account was corroborated by a family member. Her husband confirmed that she spent most of her time lying down, and that he was the household's primary caregiver and handled most of the day-to-day chores. His account sheds light on Brinley's mental state, including her ability to function around others, as well as on her chronic pain. While we are not prepared to say that the ALJ actually violated the ruling, the fact that we are remanding for other reasons leaves open the possibility of taking another look at this evidence as well.

## IV

It is not for us to say whether Brinley ultimately can prevail in her effort to qualify for disability insurance or supplemental security benefits. Our task is only to decide whether the agency's decision was adequately explained and supported by substantial evidence. Because the ALJ's hypothetical question to the vocational expert did not capture one of Brinley's most significant problems—her social-functioning deficits—we conclude that further proceedings are needed. We therefore GRANT Brinley's petition for review and REMAND this case to the Social Security Administration.