In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 18-3491

TARA L. CRUMP,

*Plaintiff-Appellant*,

*v.*

ANDREW M. SAUL,
Commissioner of Social Security,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:17-cv-557 — **Philip P. Simon**, *Judge*.

———————

ARGUED JULY 9, 2019 — DECIDED JULY 31, 2019

———————

Before KANNE, HAMILTON, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Tara Crump applied for disability benefits based on numerous mental health impairments, including bipolar disorder and polysubstance abuse disorder. An administrative law judge denied benefits, finding that Crump, despite her severe impairments, could perform work limited to simple and repetitive tasks. The district court affirmed. Because the ALJ did not adequately account for

Crump's difficulties with concentration, persistence, or pace in the workplace, we vacate the judgment and remand the case to the Social Security Administration.

**I**

Tara Crump has a long history of mental health impairments. In 2010, she underwent hospitalization for mood swings and the following year was diagnosed with bipolar disorder. In 2012, after Crump reportedly experienced a mental breakdown, a psychiatrist assessed her Global Assessment of Function range, a measure of social functionality, at 51–60, or "moderate" impairment of overall functioning. See AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 1994). (The GAF scale "no longer is widely used," but when Crump applied for benefits, the Social Security Administration sometimes considered the scores. See *Winsted v. Berryhill*, 923 F.3d 472, 474 n.1 (7th Cir. 2019).)

Crump's symptoms continued into 2013, when a nurse practitioner recorded her "pressured speech, flight of ideas, poor insight, poor judgment," tangential thoughts, insomnia, and "difficulty with focus and attention," and assigned Crump an even lower GAF range of 41–50, signaling "serious" impairment. See DSM IV at 34. Crump's symptoms escalated later the same year when her family brought her to the emergency room for "hostile" and "aggressive" behavior. This episode led to a diagnosis of acute psychosis, with Crump having experienced hallucinations, bizarre behavior, disorganized speech, insomnia, attention impairment, and decreased concentration. Crump's behavior was so severe that the hospital obtained a court order to extend her stay beyond 72 hours and medicate her involuntarily. After three

weeks of inpatient treatment, the hospital discharged Crump to outpatient care.

Crump then began a course of treatment with psychiatrist Sajja Babu, whose observations form a large part of the medical record that Crump relies upon in her application for disability benefits. Dr. Babu noted from their first appointment that Crump spoke too fast, had pressured speech, and rapidly changed conversation topics—observing that she was "somewhat irrational and unrealistic" and "not able to focus well." Dr. Babu assessed Crump with a GAF score of 40, signaling "severely" impaired functioning. See DSM IV at 34. Crump's GAF scores over the next two years ranged from "severe" to "moderate." See *id.*

Dr. Babu's treatment notes during this time reflected mixed observations on Crump's behavior. On the one hand, Dr. Babu consistently observed that Crump was "[a]ble to pay attention and concentrate" during her office visits. On the other hand, Dr. Babu regularly noted that Crump suffered from "hyperactivity, irritability, grandiosity, racing thoughts as well as thoughts of helplessness and hopelessness with crying spells and anger outbursts" as a result of her bipolar disorder. These conditions and experiences combined, Dr. Babu concluded, to leave Crump with an inability to "follow through with tasks, anticipate consequences of her decisions, interact appropriately with others as well as establish and maintain interpersonal relationships."

During this same period, from 2013 to 2015, Crump experienced other setbacks. In 2013, for example, she was arrested for fighting. Unable to support herself, Crump became homeless in 2014 and moved into a shelter. And in 2015 she was

arrested for shoplifting. Dr. Babu attributed each of these downturns to Crump's ongoing struggles with mental illness.

Crump applied for disability benefits in January 2014, claiming an onset date of March 2012, which triggered a series of additional assessments. In March 2014, Crump saw psychologist Joyce Scully for a consultative examination. Dr. Scully confirmed Crump's diagnosis of bipolar disorder with psychosis, but also noted that she was "attentive, persistent and focused" during the examination. State-agency consultants separately assessed Crump's ability to carry out short and simple instructions as "not significantly limited," but they scored her ability to maintain attention and concentration for extended periods as "moderately limited."

Crump continued seeing Dr. Babu throughout 2014 and 2015. In September 2015, Dr. Babu prepared an assessment of Crump's ability to work and sustain employment. He concluded that Crump had "no useful ability to function" in following work rules, managing stress, maintaining attention or concentration, or fulfilling job instructions. Dr. Babu likewise found not only that Crump's "bipolar symptoms interfere with her engaging in any type of work activity," but also that her related chronic emotional impairments "diminish her ability to follow through with tasks, anticipate the consequences of her decisions [and] interact appropriately with others as well as retain and process information."

After Crump's initial application for disability benefits was denied, an administrative law judge held a hearing in February 2016. For her part, Crump testified that she has "too many thoughts at one time" and "can't focus" on what she is supposed to be doing. As part of determining Crump's capacity to work, the ALJ put two hypothetical questions to a

vocational expert. The first focused on whether work was available for someone limited to "simple, routine, repetitive tasks" with few workplace changes. The VE replied yes. The ALJ then posed the same hypothetical with a critical distinction—whether work would be available *if* the person would either be off-task 20% of the time or need two unscheduled absences per month. The VE answered this second question in the negative: no jobs would be available for a person with such limitations.

Following the hearing, the ALJ concluded that, although her impairments were severe, Crump was not disabled. In making this determination, the ALJ found that Crump had "moderate difficulties maintaining concentration, persistence, or pace." But these difficulties were offset, the ALJ reasoned, by Dr. Scully's opinion that Crump was attentive, persistent, and focused. Furthermore, the ALJ attributed little weight to Dr. Babu's opinions, finding them inconsistent with his many treatment notes indicating that Crump exhibited no mood swings and maintained her attention during office visits. These findings led the ALJ to conclude that Crump had the residual functional capacity, or RFC, to perform light work limited to "simple, routine, repetitive tasks with few workplace changes" because of "issues concentrating due to racing thoughts from bipolar disorder." Accordingly, the ALJ denied Crump's application for disability benefits. The district court affirmed, and Crump now appeals.

## II

Crump argues that the ALJ did not adequately account for her moderate limitations in concentration, persistence, or pace—often shorthanded as CPP limitations—in finding that she had the functional capacity to perform "simple, routine,

repetitive tasks with few workplace changes." Crump also contends that the medical evidence shows she has these limitations and that the ALJ improperly discounted Dr. Babu's opinion about her inability to concentrate specifically in a work setting (rather than in an examination) as well as her inability to reliably complete tasks.

We agree with Crump that the ALJ did not adequately account for her moderate CPP limitations in a manner consistent with our precedent. Indeed, on several occasions in recent years we have addressed the role such CPP limitations must play in a proper RFC determination. Those cases supply the proper framework here.

Our caselaw emphasizes that "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record," including even moderate limitations in concentration, persistence, or pace. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). As a matter of form, the ALJ need not put the questions to the VE in specific terms—there is no magic words requirement. As a matter of substance, however, the ALJ must ensure that the VE is "apprised fully of the claimant's limitations" so that the VE can exclude those jobs that the claimant would be unable to perform. *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *DeCamp v. Berryhill*, 916 F.3d 671, 675–76 (7th Cir. 2019). The best way to do that is by including the specific limitations—like CPP—in the hypothetical. *Moreno*, 882 F.3d at 730.

When it comes to the RFC finding, we have likewise underscored that the ALJ generally may not rely merely on catch-all terms like "'simple, repetitive tasks'" because there is no basis to conclude that they account for problems of

concentration, persistence or pace. *Winsted*, 923 F.3d at 477 (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)). More to it, observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift. And this precise reasoning explains why in *Moreno* we rejected as inadequate a hypothetical (and the resulting RFC determination) that used that formulation—because it failed by its terms to account for moderate limitations in these areas. See 882 F.3d at 730. When the ALJ supplies a deficient basis for the VE to evaluate the claimant's impairments, this error necessarily calls into doubt the VE's ensuing assessment of available jobs. *DeCamp*, 916 F.3d at 676; *Moreno*, 882 F.3d at 730.

These principles find straightforward application here. The ALJ seemed to recognize Crump's CPP challenges when, in formulating the second hypothetical for the VE, he incorporated the express functional limitation of a person able to perform simple and repetitive tasks also being off-task 20% of the time or otherwise requiring two unscheduled absences per month. The VE opined that a person so limited would lack the functional capacity to sustain *any* employment. But the ALJ failed to incorporate this opinion anywhere in the RFC, leaving the RFC altogether uninformed by considerations of off-task time or unplanned leave.

Rather than accounting for the VE's second opinion, the ALJ instead resorted to the VE's response to the first hypothetical, which asked only about the availability of work for someone who could perform simple, repetitive tasks without incorporating any CPP limitations. In charting this course— by specifically rooting the RFC determination in a VE's

opinion that, by its terms, did not account for Crump's CPP limitations—the ALJ committed the same error that led us to reverse and remand in *Winsted*. See 923 F.3d at 477 ("Because the ALJ did not include Winsted's difficulties with concentration, persistence, and pace in the hypothetical that he *did* consider, the decision cannot stand.")

Beyond disregarding the VE's opinion in response to the second hypothetical, the ALJ gave short shrift to the medical opinions of Dr. Babu as Crump's treating psychiatrist. By itself, the ALJ's decision to discount Dr. Babu's views might not be cause for vacating the decision, see *Stepp v. Colvin*, 795 F.3d 711, 719–20 (7th Cir. 2015), but when combined with the ALJ's disregard of the highly relevant opinion of the VE—that an individual with Crump's limitations who needed to be off-task 20% of the time was not employable—the resulting RFC formulation does not hold up.

The Commissioner suggests that the ALJ's discounting of Dr. Babu's opinion makes up for any problems with the RFC finding. Not so in our view. Crump correctly observes that Dr. Babu (and, for that matter, Dr. Scully too) found only that she could pay attention in the doctor's office and thus in the context of a structured, relatively short mental health examination, an altogether different environment than a full day at a competitive workplace with sustained demands. Dr. Babu's work-related assessment directly addressed Crump's inability to perform reliably in the workplace, but, with the exception of Crump's ability to concentrate, the ALJ nowhere addressed that evaluation. We see the discounting of Dr. Babu's opinion in keeping with and indeed compounding the ALJ's error in the disregard of the VE's (second) opinion.

In closing, we owe a word to the Commissioner's reliance on our recent decision in *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019). We do not read *Jozefyk* to save the shortfalls in the ALJ's analysis here. In *Jozefyk*, we determined that any error in formulating the RFC was harmless because the claimant had not testified about any restrictions in his capabilities related to concentration, persistence, or pace, and the medical evidence did not otherwise support any such limitations. 923 F.3d at 498. As the Commissioner concedes, the facts here are different. The medical evidence plainly shows, and the ALJ recognized, that Crump suffers from CPP limitations. And, unlike in *Jozefyk*, Crump testified consistently with the medical treatment notes about how her bipolar disorder impairs her ability to concentrate well enough to work for a sustained period.

The ALJ's RFC analysis did not say enough either to accommodate or rule out what the VE's testimony and the medical record otherwise made clear—that Crump's difficulties with concentration, persistence, or pace pose a significant hurdle for her to stay on task at work. Merely limiting Crump to simple, routine, and repetitive tasks with few workplace changes was not enough to address her limitations and ensure that she could maintain the concentration and effort necessary to function in a workplace and otherwise sustain employment.

For these reasons, we VACATE the judgment and REMAND to the agency for further proceedings.